## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIA MILLER and JORDAN JUDT, on behalf of themselves and a class of all others similarly situated, | Civil No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | <u>**DEMAND FOR JURY TRIAL**</u> |
| TARGET CORPORATION, | |
| Defendant. | |

Plaintiffs Bria Miller and Jordan Judt ("Plaintiffs") individually and on behalf of themselves and all others similarly situated, bring this class action lawsuit against Defendant Target Corporation ("Target") based upon personal knowledge as to themselves, the investigation of their counsel, and on information and belief as to all other matters.

## <u>INTRODUCTION</u>

1.      This is a class action lawsuit against Defendant regarding the manufacturing, distribution, advertising, marketing, and sale of Up&Up™ branded benzoyl peroxide ("BPO") acne treatment products (the "BPO Products")[1] that contain and/or degrade into dangerously unsafe levels of benzene, a known human carcinogen.

---

[1] The BPO Products include, but are not limited to, Up&Up™ Maximum Strength 10% benzoyl peroxide gel, Up&Up™ Maximum Strength Effectiveness Acne Spot Treatment 2.5% benzoyl peroxide cream, and Up&Up™ Maximum Strength Effectiveness Acne Spot Treatment 2.5% benzoyl peroxide lotion. Plaintiffs reserve the right to amend this list if further investigation and/or discovery reveals that the list should be amended.

2.      The BPO Products are used to treat acne vulgaris ("acne") and are formulated with BPO and other inactive ingredients to make treatments for acne in various forms such as creams, scrubs, washes, and bars.

3.      Benzene is a known human carcinogen. The World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[2] Similarly, the Department of Health and Human Services ("DHHS") has determined that benzene causes cancer in humans.[3] Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[4]

4.      On March 5, 2024, Valisure LLC ("Valisure"), an independent laboratory that analyzes the safety of consumer products, filed a citizen petition (the "Valisure Petition") with the FDA detailing its findings that it detected high levels of benzene in BPO products, including Defendant's BPO Products.[5] Valisure called for the FDA to recall and

---

[2] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, INTERNATIONAL AGENCY FOR RESEARCH ON CANCER, WORLD HEALTH ORGANIZATION, https://monographs.iarc.who.int/list-of-classifications (last visited April 10, 2024).

[3] *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION (April 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited April 10, 2024).

[4] *Benzene and Cancer Risk*, AMERICAN CANCER SOCIETY https://www.cancer.org/cancer/cancer-causes/benzene.html (last visited April 10, 2024).

[5] David Light, Wolfgang Hinz, PhD, and Kaury Kucera, PhD, *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Products*, VALISURE (March 5, 2024), *available at:* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited April 10, 2024).

suspend the sale of all products containing BPO, including Defendant's BPO Products. Valisure argued that the products containing BPO are adulterated under Section 301 of the Federal Drug and Cosmetics Act ("FDCA") in violation of 21 U.S.C. § 331 and misbranded under Section 502 of the FDCA in violation of 21 U.S.C. § 352, among various other FDCA violations.

5.      Valisure's Petition detailed that products containing BPO, including the BPO Products marketed and sold by the Defendant, decomposed to form benzene under normal and expected use, handling, and storage, rendering them materially different than advertised, *i.e.*, by containing unsafe levels of benzene. Many of the BPO products that Valisure tested were found to contain benzene in many multiple times higher than allowed in any regulated drug.[6]

6.      This led Valisure to conduct a stability study on a diverse market sweep of BPO products and formulations. Valisure's results show that on-market BPO products can form over ***800 times*** the conditionally restricted FDA concentration limit of 2 parts per million ("ppm") for benzene, suggesting this problem applies broadly to BPO Products currently on the market.[7]

7.      Incubation of one of Defendant's BPO Products at the temperature accepted by the pharmaceutical industry for performing accelerated stability standards (50°C), a

---

[6] *Id.*

[7] *Valisure Discovers Benzoyl Acne Treatment Products are Unstable and Form Benzene*, VALISURE (March 6, 2024), https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited April 10, 2024).

temperature the BPO Products are expected to be exposed to through normal consumer and distributor handling, resulted in the detection of benzene up to approximately ***1600 ppm***, well above the FDA's strict concentration limit of 2 ppm for a drug product when the use of benzene is "unavoidable".[8] Overall, the testing led Valisure to conclude that on-market BPO Products appear to be fundamentally unstable and form unacceptably high levels of benzene.[9]

8.     The presence of benzene, or the risk of benzene contamination via degradation of BPO, is not disclosed on the BPO Products' labels. Therefore, Plaintiffs, by use of reasonable care, could not have discovered that the BPO Products were contaminated with benzene and/or were at risk of benzene contamination via the degrading of BPO.

9.     Although BPO is known within the scientific community to degrade to form benzene, this fact is not known among consumers. Defendant knew, or should have known, that the BPO Products contain benzene and/or degraded to form benzene when exposed to normal and expected consumer use, handling, and storage.

10.     Plaintiffs and Class Members purchased the BPO Products with the expectation that the products were safe, including free of carcinogens that are not listed on the label. Because Defendant sold products to consumers that contain dangerous levels of

---

[8] *Id.*

[9] *Id.*

benzene and/or degrade into benzene, Plaintiffs and the Class Members were deprived of the benefit of their bargain.

11.     Defendant is therefore liable to Plaintiffs and Class members for misrepresenting and/or failing to disclose or warn that the BPO Products contain benzene and/or that the BPO Products degrade to form benzene.

12.     As a result of Defendant's misconduct and consumer deception, Plaintiffs, the Class, and the public, have been economically harmed. Plaintiffs would not have purchased the BPO Products or would have paid less for them, had they known the truth.

13.     Plaintiffs seek damages, reasonable attorneys' fees and costs, interest, restitution, other equitable relief, including an injunction and disgorgement of all benefits and profits Defendant received from misconduct.

## PARTIES

14.     Plaintiff Bria Miller is a resident of Los Angeles County, California.  In August 2022, Plaintiff purchased one of Defendant's BPO Products, Up&Up ™ Maximum Strength 10% benzoyl peroxide gel, from a Target retail store located in Los Angeles, California. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, the BPO Product, if she

had known that the BPO Product was not, in fact, properly manufactured, free from defects, or safe for their intended use.

15.     Plaintiff Jordan Judt is a resident of Madison County, Nebraska.   In December 2022, Plaintiff purchased one of Defendant's BPO Products, Up&Up ™ Maximum Strength Effectiveness Acne Spot Treatment 2.5% benzoyl peroxide cream, from a Target retail store located in Norfolk, Nebraska. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that he would not have purchased, or would have paid less for, the BPO Product, if he had known that the BPO Product was not, in fact, properly manufactured, free from defects, or safe for their intended use.

16.     Defendant Target Corporation is a Minnesota corporation with its principal place of business at 1000 Nicollet Mall, Minneapolis, Minnesota, 55043. Defendant Target Corporation owns and operates the website https://www.target.com/ and markets and distributes dermatology products, including the BPO Products, in the U.S. market.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than at least

one Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

18.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District, which subjects them to general personal jurisdiction.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because many of the acts and transactions giving rise to this action occurred in this District, Defendant conducts substantial business in this District, and Defendant resides in this District.

## FACTUAL ALLEGATIONS

### A.     The Dangers of Benzene

20.     According to the U.S. Centers for Disease Control and Prevention ("CDC"), the U.S. Department of Health and Human Services has determined that benzene causes cancer in humans. Similarly, the WHO and the IARC have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[10]

21.     The National Institute for Occupational Safety and Health ("NIOSH") and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[11]

---

[10] David Light, Wolfgang Hinz, PhD, and Kaury Kucera, PhD, *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Products*, VALISURE (March 5, 2024), *available at:* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited April 10, 2024).

[11] *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/niosh/npg/npgd0049.html (last visited April 10, 2024).

22.     The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[12]

23.     The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[13]

24.     As for "where benzene is found and how it is used," the CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[14]

25.     The CDC has stated that ways in which people "could be exposed to benzene" include:

- Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor vehicle exhaust, and industrial emissions.

- Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

- The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

---

[12] *Id.*

[13] *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION (April 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited April 10, 2024).

[14] *Id.*

- Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

- People working in industries that make or use benzene may be exposed to the highest levels of it.

- A major source of benzene exposure is tobacco smoke.[15]

26.    A 2010 study titled "Advances in Understanding Benzene Health Effects and Susceptibility" summarized the epidemiological studies of the carcinogenic effects of benzene exposure and an overview of the hematotoxic effects of benzene.[16] The 2010 study concluded:

a.    There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion.

b.    Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

c.    Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

---

[15] *Id.*

[16] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, ANNUAL REVIEWS, Vol. 31:133-148 (April 21, 2010) https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646 (last visited April 10, 2024).

27.     The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[17]

28.     Where the use of benzene or other Class 1 solvents is unavoidable to produce a drug product with a significant therapeutic advance, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 ppm.[18]

29.     Recognizing the risks of benzene, in December 2022, the FDA issued a statement alerting manufacturers to the risk of benzene contamination and warned that any drug product containing more than 2 ppm benzene was adulterated and should be recalled. This statement was updated on December 27, 2023, and still provides that drug manufacturers "should not release any drug product batch that contains benzene above 2 ppm" and "[i]f any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]"[19]

---

[17] David Light, Wolfgang Hinz, PhD, and Kaury Kucera, PhD, *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Products*, VALISURE (March 5, 2024), *available at:* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited April 10, 2024).

[18] *Id.*

[19] *FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (last visited April 10, 2024) (The FDA cannot force a drug manufacturer to recall a contaminated or adulterated drug); Facts About the Current Good Manufacturing Practice (CGMP), U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practice-cgmp

30.     Over the past three years alone, the FDA has announced over a dozen recalls of various drug and cosmetic products identified as containing "low levels" or even "trace levels" of benzene, including certain hand sanitizers and aerosol drug products like sunscreens and antiperspirants.[20]

**B.     Defendant's History in the Industry**

31.     Up & Up is a registered trademark of Target Brands, Inc. Up & Up was introduced in 2009 and is one of Target's 45 private labels (or "owned brands")[21]. Target describes Up & Up as "an everyday essentials brand that offers high quality, affordable products".[22] Up & Up makes over 2,000 products, including well known products, such as

---

(last visited April 10, 2024) ("While FDA cannot force a company to recall a drug, companies usually will recall voluntarily or at FDA's request").

[20] *Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol (last visited April 10, 2024); *Edgewell Personal Care Issues Voluntary Nationwide Recall of Banana Boat Hair & Scalp Sunscreen Due to the Presence of Benzene*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/edgewell-personal-care-issues-voluntary-nationwide-recall-banana-boat-hair-scalp-sunscreen-due (last visited April 10, 2024); *P&G Issues Voluntary Recall of Specific Old Spice and Secret Aerosol Spray Antiperspirants and Old Spice Below Deck Aerosol Spray Products Due to Detection of Benzene*, U.S. FOOD & DRUG ADMINISTRATION, **Error! Hyperlink reference not valid.**https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice (last visited April 10, 2024).

[21] *Products & Services: Target Brands*, TARGET, https://corporate.target.com/about/products-services/target-brands#:~:text=up%26up%20is%20an%20everyday%20essentials,products%20and%20reformulated%20existing%20products (last visited April 11, 2024).

[22] *Id.*

Maximum Strength 10% Benzoyl Peroxide Gel Acne Medication and Maximum Strength Effectiveness Acne Spot Treatment Benzoyl Peroxide.

32.     Defendant manufactures, markets, distributes, and sells various skin care products containing BPO, including Maximum Strength 10% Benzoyl Peroxide Gel Acne Medication and Maximum Strength Effectiveness Acne Spot Treatment Benzoyl Peroxide.

33.     BPO is an active ingredient in all of Defendant's BPO Products.

34.     All of Defendant's BPO Products are manufactured in the same manner.

35.     All lots of Defendant's BPO Products systematically degrade to form benzene. As noted below, this is supported by testing of acne treatment products containing benzoyl peroxide, all of which tested positive for benzene at various levels ranging from 2,000 ppm to 1.8 ppm.

36.     Defendant's BPO Products are widely marketed, available, sold, and used by children, teenagers, and adults throughout the United States and the world. The acne treatment industry is a highly competitive billion-dollar market. To that end, Defendant aggressively marketed the BPO Products directly to children and teenagers knowing, or they should have known, the BPO Products degrade to form benzene under normal use and storage conditions. Many of Defendant's online and print advertisements featured children, teenagers, eye-catching props, music, and colors meant to attract teens and pre-teens, and appeal to their preferences, activities, and interests.

37.     Defendant makes promises to consumers, such as affirming the BPO Products are a daily treatment that helps treat acne and prevent future breakouts. Defendant provides a 100% satisfaction guarantee on all of their BPO products.

12

C.    **The Valisure Petition Identified High Levels of Benzene in Defendant's BPO Products**

38.    Valisure is an accredited independent laboratory who has developed validated analytical methods[23] to test drugs and consumer products to address rising concerns about public safety. Valisure has tested a wide variety of drugs and products for benzene including hand sanitizers, sunscreens, antiperspirants, and dry shampoos. Their work has led to widely publicized product recalls protecting the public from dangerous and carcinogenic consumer products.

39.    On March 5, 2024, Valisure submitted a public citizens petition to the FDA requesting a recall and suspension of sales of products containing benzoyl peroxide from the U.S. market.  The petition was based on testing conducted by Valisure in 2023 that found common acne treatment products formulated with BPO are not only contaminated with benzene but have levels dangerous to public health.

40.    Valisure tested 175 finished acne treatment products to determine whether any had benzene. Of the 175 products tested, 99 were formulated with BPO.[24] 83 of the BPO Products were purchased over the counter from major retailers and 16 were prescription products purchased from licensed wholesalers.[25] The BPO Products tested by Valisure included various popular products such as Proactiv 2.5% BPO Cream, Target Up

---

[23] Valisure's test methods largely mirror those utilized by FDA's own "Drug Quality Sampling and Testing" ("DQST") Program. *See Valisure FDA Citizen's Petition on Benzoyl Peroxide* at 4.

[24] *See Valisure FDA Citizen's Petition on Benzoyl Peroxide* (March 5, 2024).

[25] *Id.*

& Up 2.5% BPO Cream, Equate Beauty 10% BPO Cream, Equate BPO Cleanser, Neutrogena 10% BPO Cleanser, Clearasil 10% BPO Cream, CVS Health 10% BPO Face Wash, Walgreens 10% BPO Cream, La Roche Posay BPO Cream, and Clean & Clear 10% BPO Lotion.

41.     To evaluate the effects of common distributor and consumer use, handling, and storage conditions on benzene formation, Valisure used three incubation temperatures: (1) 37°C/98.6°F was used for human body temperature, (2) 50°C/122°F was used to evaluate shelf-life performance as an accelerated stability testing temperature used by the pharmaceutical industry,[26] and (3) 70°C/158°F to model storage in a hot vehicle.

42.     The BPO products that Valisure tested were incubated at 50°C for 18 days and benzene concentration was measured at day 0, 4, 10, 14, and 18 using industry standard gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation. These BPO containing products included creams, lotions, gels, washes, liquids, and bars, and included analysis of some of Defendant's BPO Products.[27] The results below were submitted to the FDA in Valisure's Petition on Benzoyl Peroxide:

---

[26] Ghimire, Prakash, et al., *Guidelines on Stability Studies of Pharmaceutical Products and Shelf-Life Estimation.* INTERNATIONAL JOURNAL OF ADVANCES IN PHARMACY AND BIOTECHNOLOGY (Mar. 2020), *available at:* https://www.researchgate.net/publication/342998982_Guidelines_on_Stability_Studies_of_Pharmaceutical_Products_and_Shelf_Life_Estimation (last visited April 10, 2024).

[27] *Valisure Petition* at 16

**Figure 4A**



**Figure 4B**



**Figure 4C**



**Figure 4D**



**Figure 4E**



**Figure 4F**



**Figure 4G**



**Figure 4H**



**Figure 4I**



43.     As demonstrated in the above charts, results from the 50°C stability testing

showed that every one of the tested BPO products, including Defendant's BPO Products,

contained and/or degraded to form, dangerous levels of benzene well over 2ppm, the

maximum amount allowed in any U.S. regulated drug.[28] In fact, Defendant's Up&Up™ labeled BPO Products consistently topped the charts for benzene levels over 2 ppm, including Up&Up™'s 2.5% BPO Cream which reached as high as ***1600 ppm,*** only second to Proactiv.

44.     Valisure's Petition concluded that all on-market BPO acne formulations seem to be fundamentally unstable and form unacceptably high levels of benzene under normal use, handling, and storage temperatures. Importantly, no such evidence was observed for acne treatment products not formulated with BPO.

### D.     Defendant's Failure to Warn Consumers About BPO Degradation

45.     It is well known among the scientific community that BPO degrades to benzene when exposed to heat over time and was first reported as early as 1936. [29]

46.     The BPO Products are not designed to contain benzene.

47.     Although Defendant claims to not be the manufacturer of the BPO Products, manufacturer information does not appear anywhere on any labels or on Defendant's website.,

48.     Defendant knew or should have known, of the well-known chemical processes that degrades the BPO in products into benzene when exposed to common use temperatures and conditions.

---

[28] *Valisure FDA Citizen's Petition* at 16-18.

[29] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* HELVETICA, Vol. 19, Issue 1, 338 (1936), *available at:* https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153   (last visited April. 10, 2024).

49.     Each of Defendant's BPO Products lists the ingredients of the BPO Products on their labels, including benzoyl peroxide. What Defendant fails to disclose on the BPO Products' labeling, or anywhere in its marketing, is that the BPO Products contain benzene and/or that the BPO in the BPO Products degrade to form benzene even under normal and expected use, handling, and storage.

50.     Defendant should have known through its own research, development, formulation, manufacturing, and testing that the BPO Products were not chemically and physically stable. Defendant was required to make sure they adequately tested its BPO Products for safety and stability before selling them to the public, as well as monitor their internal practices, processes, and specifications to make sure their processes and procedures met current and emerging scientific methodologies. This means that during expiration and stability studies examining the "shelf life" of the BPO Products, Defendant knew, or should have known, that the chemical changes in BPO to benzene took place during normal and expected use and storage conditions.

51.     Moreover, Defendant knew, or should have known, the BPO Products would be handled, used, and stored by distributors, sellers, and consumers under various temperatures that affect chemical stability. For example, Defendant knew, or should have known, the BPO Products would travel by commercial carriers and distributors in varying storage conditions. Defendant knew, or should have known, that the BPO Products would be stored by consumers in bathrooms, showers, and in vehicles during warm months where the BPO Products would be exposed to heat.

52.     The use, handling, and storage conditions were known, or should have been known, to Defendant prior to the BPO Products being marketed and sold to Plaintiffs and the Class. Defendant knew, or should have known, that under these normal use, handling, and storage conditions by consumers, that the BPO in the BPO Products would degrade to benzene, exposing consumers to the dangerous carcinogen. Regardless of this fact, Defendant still sold them to Plaintiffs, the Class, and the public anyway, without warning of the risk of exposure.

## CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of the following Classes:

> All persons who purchased one or more of Defendant's BPO Products in the United States for personal/household use within any applicable limitations period (the "Nationwide Class").

54.     Plaintiff Judt brings this action individually and on behalf of the following Nebraska subclass:

> All persons who purchased one or more of Defendant's BPO Products in the state of Nebraska for personal/household use within any applicable limitations (the "Nebraska Subclass").

55.     Plaintiff Miller brings this action individually and on behalf of the following California subclass:

> All persons who purchased one or more of Defendant's BPO Products in the state of California for personal/household use within any applicable limitations (the "California Subclass").

56.     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's

20

subsidiaries, parents, successors, predecessors, and any entities in which Defendant or their parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of BPO Products.

57.     **Numerosity (Rule 23(a)(1)):** The exact number of Class Members is unknown and currently unavailable to Plaintiffs, but joinder of individual members herein is impractical. The Class is likely comprised of thousands of consumers. The precise number of Class Members, and their addresses, is unknown to Plaintiffs at this time, but can be ascertained from Defendant's records and/or retailer records. The Class Members may be notified of the pendency of this action by mail or email, Internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

58.     **Predominant Common Questions (Rule 23(a)(2) and (b)(3)):** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. The common and legal questions include, but are not limited to, the following:

     a.    Whether the BPO Products contain and/or degrade into benzene;

     b.    Whether Defendant knew, or should have known, that the BPO Products contain and/or degrade into benzene;

     c.    Whether Defendant's representations and omissions, in its marketing, advertising, labeling, and packaging of the BPO Products, are misleading;

     d.    Whether Defendant's representations and omissions, in its marketing, advertising, labeling, and packaging of the BPO Products are

reasonably likely to deceive;

e.    Whether Defendant engaged in false and misleading advertising;

f.    Whether Defendant's internal testing showed that its products contained and/or degraded to form benzene;

g.    Whether Defendant violated the state consumer protection statutes alleged herein;

h.    Whether Defendant breached their implied warranties;

i.    Whether Defendant were unjustly enriched;

j.    The nature of relief, including damages and equitable relief, to which Plaintiffs and Class Members are entitled.

59.    **Typicality of Claims (Rule 23(a)(3)):** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other Class Members, purchased the BPO Products, suffered damages as a result of that purchase, and seeks the same relief as the proposed Class Members.

60.    **Adequacy of Representation (Rule 23(a)(4)):** Plaintiffs adequately represents the Class because their interests do not conflict with the interests of the Class Members, and they have retained counsel competent and experienced in complex class action and consumer litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of the Class Members.

61.    **Superiority (Rule 23(b)(3)):** A class action is superior to other available means of adjudication for this controversy. It would be impracticable for Class Members to individually litigate their own claims against Defendant because the damages suffered by Plaintiffs and the Class Members are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for

inconsistent judgments and delay and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

62. **Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)):** In the alternative, this action may properly be maintained as a class action because the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for the Defendant; or the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I

**MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
*MINN. STAT. § 325F.68, et seq.*
**(On behalf of Plaintiffs and the Nationwide Class against Defendant)**

63. Plaintiffs, on behalf of themselves and the Nationwide Class, hereby incorporate all other paragraphs of this Complaint and restates them as if fully set forth herein.

64. Minnesota's Private Attorney General Statute (Minn. Stat. § 8.31, subd. 3a) allows Plaintiffs and the Class to bring a claim under Minn. Stat. § 325F.69.

65. The Minnesota Prevention of Consumer Fraud Act prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. . ." Minn. Stat. § 325F.69(1). Defendant's advertising, labels, and containers of its BPO Products represented to Plaintiffs and members of the Nationwide Class that the BPO Products possessed certain qualities and characteristics, including, but not limited to, being properly manufactured, free from defects, including free of carcinogens that are not listed on the label, and safe for their intended use. Other states across the country have enacted substantially similar consumer protection statutes which require the same or similar showings of proof, and which prevent the unlawful conduct described herein.[30]

---

[30] *See* Alaska Stat. § 45.50.471, *et seq.*, Ark. Code § 4-88-101, *et seq.*, Colo. Rev. Stat. § 6-1-105, *et seq.*, Conn. Gen. Stat. § 42-110b, *et seq.*, 6 Del. Code § 2511, *et seq.*, D.C. Code § 28-3901, *et seq.*, Fla. Stat. § 501.201, *et seq.*, Ga. Code Ann. § 10-1-393, *et seq.* and Ga. Code Ann. § 10-1-370 *et seq.*, Haw. Rev. Stat. § 480, *et seq.*, Idaho Code § 48-601, *et seq.*, 815 ILCS § 505/1, *et seq.*, Kan. Stat. § 50-623, *et seq.*, Ky. Rev. Stat. § 367.110, *et seq.*, La. Rev. Stat. § 51:1401, *et seq.*, M.G.L. c. 93A, *et seq.*, Me. Rev. Stat. Ann. tit. 5, § 205-A, *et seq.*, Md. Com. Law Code § 13-101, *et seq.*, Mich. Stat. § 445.901, *et seq.*, Missouri Stat. § 407.010, *et seq.*, Neb. Rev. Stat. §§ 59-1601, *et seq.*, Nev. Rev. Stat. § 598.0903, *et seq.*, N.H. Rev. Stat. § 358-A:1, *et seq.*, N.J. Rev. Stat. § 56:8-1, *et seq.*, N.M. Stat. § 57-12-1, *et seq.*, N.Y. Gen. Bus. Law § 349 *et seq.*, N.D. Cent. Code § 51-15-01, *et seq.*, Ohio Rev. Code Sec. 4165.01 *et seq.*, Okla. Stat. 15 § 751, *et seq.*, Or. Rev. Stat. § 646.605, *et seq.*, R.I. Gen. Laws. § 6-13.1-1, *et seq.*, S.C. Code Laws § 39-5-10, *et seq.*, S.D. Code Laws § 37-24-1, *et seq.*, Tex. Bus. & Com. Code § 17.45, *et seq.*, 9

66.     Defendant's advertisements and representations with respect to the BPO Products were made in connection with the sale of BPO Products to Plaintiffs and the Nationwide Class.

67.     Defendant intentionally and/or knowingly misrepresented and/or failed to disclose or warn Plaintiffs and the Nationwide Class that the BPO Products contain benzene and/or that the BPO Products degrade to form benzene.

68.     Defendant misrepresented its BPO Products in advertising, labels, and containers and misled Plaintiffs, members of the Nationwide Class, and the public about the ingredients, characteristics, purity, quality, approval, and safety of the BPO Products. Defendant intended for Plaintiffs and the Nationwide Class to rely on, and accept as true, these advertisements and representations with respect to the ingredients and safety of the BPO Products when deciding which acne treatment to purchase.

69.     Defendant's unfair or deceptive acts or practices were likely to deceive reasonable consumers about the BPO Products and, by extension, the true value of the BPO Products. Reasonable consumers expect to be told about all ingredients in BPO Products. Reasonable consumers further expect that carcinogens, or risk of carcinogens, in the BPO Products be disclosed. Additionally, because Defendant failed to disclose that the BPO Products contained and/or degraded to form benzene, and therefore advertised the products with intent not to sell them as advertised, this conduct created a likelihood of confusion or of misunderstanding.

---

Vt. § 2451, *et seq.*, Va. Code § 59.1-196, *et seq.*, Wash. Rev. Code. § 19.86.010, *et seq.*, W. Va. Code § 46A-6-101, *et seq.*, Wis. Stat. Ann. § 100.18, *et seq.*

70.     Plaintiffs and the Nationwide Class were injured in fact and suffered actual damages as a result of their reliance on Defendant's advertisements and representations with respect to the BPO Products, Defendant's wrongful conduct was the direct and proximate cause of the injuries to Plaintiffs and the Class. Because of Defendant's unlawful conduct, the value of the BPO Products has been greatly diminished, as the BPO Products contain and/or degrade into benzene through normal and expected handling, use, and storage and are unfit and unsafe for human use.

71.     Had Plaintiffs and the Nationwide Class been aware that the BPO Products were unfit and unsafe for human use, Plaintiffs and the Nationwide Class would have either paid less for the BPO Products or would not have purchased them at all. Plaintiffs and the Nationwide Class did not receive the benefit of their bargain as a result of Defendant's misconduct.

72.     Pursuant to Minn. Stat. § 8.31, subd. 3a, Plaintiffs and the Nationwide Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota Prevention of Consumer Fraud Act.

## COUNT II

**MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**Minn. Stat. § 325D.43, *et seq.***
**(On behalf of Plaintiffs and the Nationwide Class against Defendant)**

73.     Plaintiffs, on behalf of themselves and the Nationwide Class, hereby incorporate all other paragraphs of this Complaint and restates them as if fully set forth herein.

74.     Defendant is a "person" within the meaning of the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA").

75.     Defendant willingly engaged in deceptive trade practices, in violation of the MUDTPA, by:

      a.    Representing that its BPO Products have characteristics, ingredients uses, and benefits that they do not have;

      b.    Representing that its BPO Products are of a superior standard, quality, and grade when they contain and/or degrade to form benzene; and

      c.    Representing that its BPO Products do not include benzene when they do and/or degrade to form benzene.

76.     Defendant knew or should have known that the BPO Products did not have the ingredients, uses, and benefits described herein because they contain and/or degrade to form benzene.

77.     Defendant knew or should have known that the BPO Products were not of a superior standard, quality, or grade because they contain and/or degrade to form benzene that a reasonable consumer would consider material.

78.     Defendant knew or should have known that the BPO Products contain and/or degrade to form benzene, as it is a known fact in the scientific community that BPO degrades to form benzene.

79.     Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Class with respect to the BPO Products' ingredients, uses, benefits, standards, quality, grade, and suitability for human usage.

80.     Defendant intended that Plaintiffs and the Nationwide Class would rely on Defendant's misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the BPO Products' ingredients, uses, benefits, standards, quality, grade, and suitability for human usage.

81.     Defendant's conduct and omissions described herein occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

82.     The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs and any reasonable consumer would have considered them in deciding whether to purchase the BPO Products. Had Plaintiffs known the BPO Products did not have the quality and ingredients advertised by Defendants, they would not have purchased the BPO Products.

83.      Defendant intended that Plaintiffs and the Nationwide Class would rely on the deception by purchasing the BPO Products, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

84.     Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

85.     As a result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they have purchased BPO Products that is worth less than the price they paid and that they would not have purchased at all had they known the BPO Products contains and/or degrades to form benzene through normal and expected use, handling, and

storage. There is an association between Defendant's acts and omissions as alleged herein and the damages suffered by Plaintiffs.

86.     As a direct and proximate result of Defendant's violations of the MUDTPA, Plaintiffs and the Nationwide Class have been injured, and that harm is likely to continue unless Defendant is enjoined from misrepresenting the ingredients, uses, benefits, standard, quality, grade, and suitability for human usage of its BPO Products described herein.

87.     Pursuant to Minn. Stat. § 325D.45, Plaintiffs and the Class seek injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUDTPA.

## COUNT III

### CALIFORNIA'S UNFAIR COMPETITION LAW
*Bus. & Prof. Code § 17200 et seq.,*
**(On behalf of Plaintiff Miller and the California Subclass against Defendant)**

88.     Plaintiff Miller, on behalf of herself and the California Subclass, hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

89.     Defendant is a "person" as defined by CAL. BUS. & PROF. CODE § 17201.

90.     California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq.*, prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising." Defendant regularly transacts business in California and has engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California.

91.     Defendant violated CAL. BUS. & PROF. CODE §§ 17200, *et seq*. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

92.     Defendant misrepresented its BPO Products in advertising, labels, and containers and misled Plaintiff Miller, the Subclass, and the public about the ingredients, characteristics, purity, quality, approval, and safety of the BPO Products. Defendant led Plaintiff Miller, the Subclass, and the public to believe the BPO Products were safe.

93.     Defendant's advertising, online representations, labeling, and packaging of the BPO Products were misleading, fraudulent, and deceptive. Defendant knew through the BPO Products' development, formulation, research, and pre-sale safety and stability testing, the BPO Products were not chemically and physically stable when exposed to common temperature conditions. Defendant knew or should have known the BPO Products degraded to form benzene under normal and expected consumer use, handling, and storage conditions, and that consumers would be exposed to benzene. Defendant were specifically reminded by the FDA of its obligation to ensure the safety and quality of their BPO Products, including testing them for benzene before selling them to the public, but shirked their duties and continued to market and sell the BPO Products without substantiating their safety, or warning Plaintiff Miller, the Class, and the public about benzene.

94.     Defendant failed to disclose material facts to consumers in advertising and on the BPO Product labels, including but not limited to, that the BPO Products contain and/or degrade to form benzene, a known human carcinogen, with normal and expected usage, handling, and storage, and are unsafe for use. The labels for the BPO Products did not warn consumers that benzene was and/or would become present, and that as a result,

30

the BPO Products were of a particular standard, quality, or grade when they were of another.

95.     Additionally, because Defendant failed to disclose that the BPO Products contained and/or degraded to form benzene, and therefore advertised the products with intent not to sell them as advertised, this conduct created a likelihood of confusion or of misunderstanding. Defendant's acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about all ingredients in BPO Products. Reasonable consumers further expect that carcinogens in the BPO Products be disclosed. Reasonable consumers further expect that on market drugs to be free of carcinogens, unless told otherwise.

96.     Defendant had a duty to disclose material facts to consumers, including but not limited to, that the BPO Products contain and/or degrade to form benzene through normal and expected usage, handling, and storage, and are unsafe for use. These material facts should have been disclosed because they were contrary to Defendant's representations about the BPO Products.

97.     Consumers could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

98.     Defendant's acts, omissions, and concealment of material health and safety information are ongoing and continuing to cause harm. Defendant continued to market,

advertise, and sell the BPO Products to the public without telling the public about benzene in the BPO Products, or the risk of contamination, and the risk of cancer. Defendant continued to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not tested the BPO Products for benzene or quantified the levels of benzene formed in the Products during normal and expected storage conditions.

99.    Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiff Miller and the California Subclass members, and not outweighed by any benefit. Omitting and concealing material human health and safety information such as benzene in the BPO Product and the consumers' risk of cancer from the BPO Products is unethical, unscrupulous, and offensive.

100.    As a direct and proximate cause of Defendant's deceptive acts and practices, Plaintiff Miller and the California Subclass members have been injured and harmed because they would not have purchased the BPO Products on the same terms if they knew the true facts regarding the benzene content in the BPO Products.

101.    Because of Defendant's misconduct, Plaintiff Miller, on behalf of herself, and the California Subclass, seek recovery of their economic damages, attorneys' fees, restitution, and all other relief allowable under CAL. BUS. & PROF. CODE § 17200, et seq., including an injunction to enjoin Defendant from continuing their fraudulent and deceptive business practices. The damages sought are ascertainable, uniform to the Class and can be measured and returned to the Class members.

## COUNT IV

**CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT,**
*CAL. CIV. CODE § 1750, et seq.,*
**(On behalf of Plaintiff Miller and the California Subclass against Defendant)**

102.    Plaintiff Miller hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

103.    Plaintiff Miller brings this cause of action on behalf of herself, and the California Subclass members, all of whom are similarly situated consumers within the meaning of CAL. CIV. CODE § 1781.

104.    The Consumers Legal Remedies Act, CAL. CIV. CODE §§ 1750, et seq.("CLRA") is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

105.    Target is a "person" as defined by CAL. CIV. CODE §§ 1761(c) and 1770, and has provided "services" as defined by CAL. CIV. CODE §§ 1761(b) and 1770.

106.    Plaintiff Miller and the California Subclass are "consumers" as defined by CAL. CIV. CODE §§ 1761(d) and 1770 and have engaged in a "transaction" as defined by CAL. CIV. CODE §§ 1761(e) and 1770.

*107.*    California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq. prohibits* unfair methods of competition and unfair or deceptive acts or practices in connection with the sale of consumer goods. Defendant violated several prohibitions of CAL. CIV. CODE § 1750(a).

108. Defendant violated CAL. CIV. CODE § 1750(a)(2) by representing the source, sponsorship, and approval, of the BPO Products, *e.g.,* the BPO Products were backed by sound scientific principles, that Defendant met its obligations to conduct adequate and meaningful quality and safety testing before selling the BPO Products to the public, and represented the BPO Products only contained the ingredients listed, and were free of carcinogens.

109. Defendant violated CAL. CIV. CODE § 1750(a)(5) by representing the BPO Products have characteristics, ingredients, uses, or benefits, which they do not, *e.g.,* misleading Plaintiff Miller and the Class members the Products only contained the listed ingredients, did not contain benzene, and did not increase the risk of the consumers' risk of cancer.

110. Defendant violated CAL. CIV. CODE § 1750(a)(7) by representing the BPO Products were pure and of a particular standard or quality, when they are not.

111. Defendant violated CAL. CIV. CODE § 1750(a)(9) by advertising the Products with the intent not to sell them as advertised*, e.g.,* the BPO Products were of pure quality, safe, made in conformity with current good manufacturing practices, and not adulterated.

112. Had Defendant been truthful in their advertising, labeling, packaging, warnings, and online statements about benzene in the Products and the risk of cancer, Plaintiff Miller and the California Subclass members would not have bought the BPO Products. Benzene, a human carcinogen, in a widely marketed and available consumer drug product, is material health and safety information Defendant knew Plaintiff Miller, the Class members, and the public would want to know. The Defendant's omission of this

material information was common to Plaintiff Miller and all Subclass members and made to Plaintiff Miller and all Subclass members uniformly through common advertising, online representations, labeling, and packaging.

113. Defendant's acts, omissions, and concealment of material health and safety information are ongoing and continuing to cause harm. Defendant continued to market, advertise, and sell the BPO Products to the public without telling the public about benzene in the BPO Products and the risk of cancer. Defendant continues to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not quantified the levels of benzene in and created in the BPO Products during normal and expected storage conditions.

114. Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiff Miller and the Subclass members, and not outweighed by any benefit. Omitting and concealing material human health and safety information such as the consumers' risk of cancer from exposure to the BPO Products is unethical, unscrupulous, and offensive.

115. Plaintiff Miller suffered ascertainable economic losses because of Defendant's misconduct because she bought the BPO Products, she otherwise would not have but for Defendant's misrepresentations.

116. Because of Defendant's misconduct, Plaintiff, on behalf of herself and the California Class seek an injunction to enjoin Defendant from continuing their fraudulent business practices. On April 12, 2024, Defendant was served with a pre-suit notice letter pursuant to CLRA § 1782. The letter was sent certified mail, return receipt requested, and

provided notice of Defendant's violation of the CLRA and demands that Defendant correct the unlawful, unfair, false and/or deceptive practices alleged here. If Defendant does not fully correct the problem for Plaintiff Miller and for each member of the California Subclass within 30 days after service of Plaintiff Miller's notice letter, Plaintiff Miller and the California Subclass will amend their complaint to seek all monetary relief allowed under the CLRA.

## COUNT V

**CALIFORNIA'S FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On behalf of Plaintiff Miller and the California Subclass against Defendant)**

117.    Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

118.    California's False Advertising Law prohibits untrue or misleading statements or omissions in connection with the sale of goods.

119.    Defendant's failure to adequately disclose the presence and/or degradation of BPO to form benzene in the BPO Products, as set forth herein, is likely to deceive the public.

120.    Defendant knew, or should have known, that the BPO Products contained and/or degraded to form benzene and had a duty to disclose its presence and/or the risk of exposure to consumers.

121.    By failing to alert consumers to the presence and/or degradation of BPO to form benzene, Defendant misled consumers.  Defendant knew, or should have known, that its omissions would result in misleading reasonable consumers.

122.    Defendant continues to omit the presence and/or risk of degradation of BPO to form benzene from its representations and labeling concerning the BPO Products.  Prospective injunctive relief is necessary to cure Defendant's conduct.

123.    Plaintiff Miller and the California Subclass Members are entitled to injunctive and equitable relief, and restitution in the form of a full refund for the amount spent on the BPO Products.

## COUNT VI

**NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**Neb. Rev. Stat. §§ 87-301,** *et seq.*
**(On behalf of Plaintiff Judt and the Nebraska Subclass against Defendant)**

124.    Plaintiff Judt, on behalf of himself and the Nebraska Subclass, hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

125.    Defendant and Nebraska Subclass Members are "persons" as defined by NEB. REV. STAT. § 87-301(19).

126.    Defendant advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska.

127.    Defendant engaged in deceptive trade practices in the course of its business, in violation of NEB. REV. STAT. § 87-302(a).

128.    Defendant failed to disclose material facts to consumers in advertising and on the BPO Product labels, including but not limited to, that the BPO Products contain and/or degrade into benzene, a known human carcinogen, with normal and expected usage, handling, and storage, and are unsafe for use. The labels for the BPO Products did not warn

consumers that benzene was and/or would become present, and that as a result, the BPO Products were of a particular standard, quality, or grade when they were of another.

129.   Additionally, because Defendant failed to disclose that the BPO Products contained and/or degraded to form benzene, and therefore advertised the products with intent not to sell them as advertised, this conduct created a likelihood of confusion or of misunderstanding.

130.   Defendant knew or should have known that its conduct violated Nebraska's Uniform Deceptive Trade Practices Act.

131.   Defendant had a duty to disclose material facts to consumers, including but not limited to, that the BPO Products contain and/or degrade into benzene through normal ad expected usage, handling, and storage, and are unsafe for use. These material facts should have been disclosed because they were contrary to Defendant's representations about the BPO Products.

132.   Defendant acted intentionally, knowingly, and maliciously to violate Nebraska's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff's and Nebraska Subclass members' rights.

133.   Consumers could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

134.    As a direct and proximate cause of Defendant's deceptive acts and practices, Plaintiff Judt and the Nebraska Subclass members have been injured and harmed because they would not have purchased the BPO Products on the same terms if they knew the true facts regarding the benzene content in the BPO Products.

## COUNT VII

### BREACH OF IMPLIED WARRANTY
**(On behalf of Plaintiffs and the Nationwide Class against Defendant)**

135.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

136.    Defendant, as a seller of the BPO Products, made implied warranties including warranting the BPO Products were of the same quality and purity represented on the labels, in advertising, and on Defendant's websites and in advertising. Defendant represented the Products were fit for the ordinary purpose and conformed to the promises made on the containers, labels, advertising, and websites that all ingredients were listed, and all warnings given.

137.    Defendant advertised its BPO Products as safe, when it knew, or should have known, that the BPO in the PBO Products degraded to form benzene. Defendant did not list benzene as an ingredient or contaminant anywhere on the Products or advertising. Defendant did not list proper storage procedures anywhere on the BPO Products or advertising to limit the risk of BPO degradation into benzene. The Products are not of the quality and purity represented by Defendant because the BPO in the BPO Products degrade to benzene under normal use, handling, and storage conditions.

138.    Defendant did not tell Plaintiffs, the Class, or Subclass members the BPO Products were not fit for their ordinary use because the BPO Products, as advertised and sold by Defendant, degraded to benzene under normal and expected handling, use, and storage.

139.    Plaintiffs, the Class, and Subclass members purchased the BPO Products in reasonable reliance on Defendant's statements, affirmations, and omissions of material health and safety information.

140.    Defendant's acts and omissions are ongoing and continuing to cause harm.

141.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, the Class, and Subclass members, seeks recovery of their actual damages, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendant's BPO Products.

## COUNT VIIII

### UNJUST ENRICHMENT
### (On behalf of the Plaintiffs and the Class against Defendant)

142.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

143.    Plaintiffs and Class Members conferred benefits upon Defendant. Plaintiffs and Class Members paid money for Defendant's worthless and defective BPO Products.

144.    Defendant has unjustly retained the benefits conferred upon them by Plaintiffs and Class Members.

145. Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Specifically, Defendant retained those benefits even though Defendant's BPO Products contain and/or degrade into benzene through normal and expected handling, use, and storage and are unfit and unsafe for human use. If Plaintiffs and Class Members had known the true nature of Defendant's BPO Products, they would not have purchased the products or would have paid less for them. Plaintiffs and Class Members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

146. Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and Class Members for their unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, prays for relief and judgment against Defendant as follows:

a. Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

b. Awarding Plaintiffs and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c. Awarding Plaintiffs and the Classes appropriate relief, including but not limited to actual damages;

d. For declaratory and equitable relief, including restitution and disgorgement;

e. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

f.      Awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

g.      Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs  as allowable by law;

h.      Awarding pre-judgment and post-judgment interest; and

i.      Granting any other relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated: April 12, 2024                    Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN PLLP**

*s/ Robert K. Shelquist*
Robert K. Shelquist, #21310X
Rebecca A. Peterson, #0392663
Krista K. Freier, #0390223
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com
kkfreier@locklaw.com

Mark S. Reich*
Courtney E. Maccarone*
Melissa Meyer*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10006
Tel:    (212) 363-7500
Fax:    (212) 363-7171
mreich@zlk.com
cmaccarone@zlk.com
mmeyer@zlk.com

*Counsel for Plaintiffs*

* *pro hac vice* forthcoming